UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| WILLIAM C. DAVIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 03 C 6362 |
| | ) | |
| UNUM LIFE INSURANCE COMPANY | ) | |
| OF AMERICA, and REGAL-BELOIT | ) | |
| CORPORATION LONG TERM | ) | Judge Rebecca R. Pallmeyer |
| DISABILITY PLAN, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff William Davis was an employee of the Regal-Beloit Corporation from February 4, 1999 until his termination in January 28, 2000. While employed by Regal-Beloit, Plaintiff participated in the Regal-Beloit Corporation Long-Term Disability Plan. In August 2000, after his termination, Plaintiff submitted a claim for total disability benefits based upon a diagnosis of major depression. The plan's underwriter, Defendant Unum Life Insurance Company of American ("Unum"), approved the claim, subject to the plan's 24-month limitation for coverage of claims based on mental illness. In June 2001, approximately six months before his disability coverage was scheduled to expire, Plaintiff submitted an additional claim based on a number of alleged physical disabilities. Unum declined coverage after investigating the new claim, and subsequently denied a number of appeals brought by Plaintiff. On July 25, 2002, Unum cancelled Plaintiff's disability coverage pursuant to the 24-month limitation. Plaintiff now brings a claim seeking restoration of disability income benefit payments under § 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1132(a)(1)(B) ("ERISA"). Defendants have moved for summary judgment and Plaintiff has filed a cross-motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 and, in the alternative, requests findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52. For the reasons set forth below, Defendants' motion is denied, and Plaintiff's motion is granted. The case is remanded to the Unum Plan

administrator for further review.

## FACTUAL BACKGROUND

This action stems from a long-term disability insurance policy (the "Unum Policy") established and funded by Plaintiff's former employer, the Regal-Beloit Corporation ("Regal Beloit"), and administered by Unum.

## I.    Relevant Policy Provisions

At issue is whether Plaintiff suffers from a physical disability under the Unum Policy, and therefore entitled to continued disability benefits.  Under the Unum Policy, a claimant qualifies as disabled "when Unum determines that" the claimant is "limited from performing the material and substantial duties of [his] regular occupation due to [his] sickness or injury [causing a] 20% of more loss in [his] indexed monthly earnings."  (Defendants' Local Rule 56.1(a) Statement, hereinafter "Defs.' 56.1(a)," ¶ 9; Administrative Record, hereinafter R., at UACL00458.)  The policy provides that "disabilities due to mental illness have a limited pay period up to 24 months."  (Defs.' 56.1(a) ¶ 10; R. at UACL00447.)  Moreover, regardless of the type of disability, in order to receive benefits for more than 24 months, a claimant must show that he is "unable to perform the duties of any *gainful occupation* for which [he is] reasonable fitted by education, training or experience."  (*Id.*)  The Policy's Certificate of Coverage grants Unum "discretionary authority to determine [the claimant's] eligibility for benefits and to interpret the terms and provisions of the policy."  (Defs.' 56.1(a) ¶ 8; R. at UACL00462.)

## II.   Claim for Long-Term Disability Benefits

Plaintiff has suffered from a variety of health problems throughout his life.  He survived a bout with polio at age seven, which left him with atrophy of his left calf muscle.  (R at UACL00088.)  He has a history of elevated cholesterol, hypertension, and diabetes.  (R. at UACL00090.)  In addition, Plaintiff has long suffered from recurring episodes of severe depression, for which he takes a variety of prescription medications.  (*Id.*)

Plaintiff was employed as a regional sales manager by the Regal-Beloit Corporation in

2

Chicago from approximately February 4, 1999 until January 28, 2000. (Defs.' 56.1(a) ¶¶ 4, 11.) On January 12, 2000, Plaintiff was admitted to Holy Family Medical Center for evaluation and management of a possible transient ischemic attack (stroke). (Plaintiff's Local 56.1(a) Statement, hereinafter "Pl.'s 56.1(a)," ¶ 69.) Upon Plaintiff's admission, the treating physician, Dr. Alan Reich, noted that Plaintiff was unable to communicate, comprehend words, or do basic arithmetic. (Id.) After examining Plaintiff, Dr. Reich expressed his opinion that Plaintiff had suffered a transient ischemic attack and not a stress-related disorder. (Id. ¶ 76.)

Plaintiff's employment at Regal-Beloit was terminated on approximately January 28, 2000. Defendants maintain that Plaintiff's employment was terminated due to poor performance. (Defendants' Response to Plaintiff's Local 56.1(a) Statement ¶¶ 7, 23; R. at UACL00023.) In an "Education and Employment History" form submitted to Unum as part of his claim, Plaintiff conceded that he "was let go because of memory and decisionmaking" problems, (Education and Employment History form, R. at UACL000269), but he asserts in this litigation that he was terminated "due to arthritis pain, severe depression, loss of memory, and other medical conditions subsequent to suffering a stroke." (Pl.'s 56.1(a) ¶ 7; Long Term Disability Claim: Employee's Statement, R. at UACL00019.)

On July 10, 2000, after the Unum Policy's 180-day elimination period had passed, Plaintiff filed a claim for long-term disability benefits under the Unum Policy, alleging that he had been disabled since January 28, 2000. (Pl.'s 56.1(a) ¶ 14.) Plaintiff claimed that he was eligible for long-term benefits because he suffered "arthritis pain in the joints, severe depression, loss of memory, and stroke." (Pl.'s Res. to Defs.' 56.1(a) ¶ 17; Long Term Disability Claim: Employee's Statement, R. at UACL00019.) As a result of these ailments, Plaintiff claimed that he was unable to lift, drive, or walk. (R. at UACL00019.) In support of his application, Plaintiff submitted a statement by Dr. Alan M. Reich concluding that he suffers from "major depression." (Defs.' 56.1(a) ¶ 17; Long Term Disability Claim: Physician's Statement, R. at UACL 00017.) Dr. Reich's statement also listed "weakness and atrophy of the left calf causing back and hip pain" as a secondary condition

3

contributing to his disability. (Pl.'s 56.1(a) ¶ 16; Long Term Disability Claim: Physician's Statement, R. at UACL00017.)

At Unum's request, Plaintiff provided the names of eight treating physicians and a list of medications prescribed for the treatment of diabetes, high-blood pressure, osteoarthritis, elevated cholesterol, and depression. (Pl.'s 56.1(a) ¶¶ 35-36.) Unum subsequently obtained medical records from Plaintiff's many health care providers. (Defs.' 56.1(a) ¶¶ 25-27.) These records revealed that Plaintiff had suffered from recurring incidents of major depression dating back to the early 1990s, and had been hospitalized with suicidal ideation in 1998. (Id. ¶ 19.) In March and April 2000, Dr. Joshua Barnes performed a series of three neurophysical evaluations on Plaintiff, concluding that he suffered from major depression and depressive pseudodementia. (Id. ¶¶ 19-20.) Another neurologist, Dr. Barry Levy, examined Plaintiff and found that he suffered from "periodic limb disorder" which appeared with sleep apnea. (Letter from Berry Levy to Alan Reich, Appendix to Defs.' 56.1(1), hereinafter R., at UACL00009.) In a letter dated May 23, 2000, Dr. Levy concluded, however, that "depression is causing his symptoms," and recommended that Plaintiff see a psychiatrist. (Id. ¶ 21; Letter from Barry Levy to Alan Reich, R. at UACL00009.)

On June 29, 2000, Dr. Keith Poteet, a chiropractor, treated Plaintiff for chronic right shoulder, lower back, and left hip pain. (R. at UACL00211-00209.) Dr. Poteet concluded that Plaintiff experiences pain after standing for 90 seconds, and that after three to five minutes the pain becomes unbearable and Plaintiff must sit down. (Id. at UACL00210.) He also concluded that Plaintiff experiences pain when sitting for extended periods of time and that he must "move or readjust" after sitting for ten minutes. (Id.)

As part of its initial investigation, Unum requested and received a job analysis from Plaintiff's employer. This analysis indicated that, as a sales manager for Regal-Beloit, Plaintiff was responsible for monitoring the performance of the sales department, answering sales questions, and working directly with customers. (Long Term Disability Claim: Job Analysis, R. at UACL 31-30.) The job involved alternately standing and sitting, although it required Plaintiff to travel by

4

automobile or airplane up to 20% of the time. (Id.) According to the job analysis, Plaintiff was never required to stoop, kneel, reach overhead, or climb stairs, and only "rarely" required to lift or carry objects. (Id.)

In light of this job analysis, Unum placed Plaintiff under surveillance during a three-day period in September 2000. (Defs.' 56.1(a) ¶ 29.) On September 27, 2000, investigators videotaped Plaintiff driving to and from the gas station, filling his car with gasoline, and carrying his garbage can and recycling bin into the house. (Pl.'s Res ¶ 30; Investigation Report, R. at UACL00187.) During these activities, Plaintiff was observed "walking, standing, sitting, lifting, carrying, pushing, bending over a 90 degree angle, entering and exiting a vehicle, and driving." (Defs.' 56.1(a) ¶ 30; Investigation Report, R. at UACL00187.) On September 28, Davis was observed driving his car to and from a gas station, and retrieving his mail. (Id. ¶ 30, Investigation Report, R. at UACL00184-00183.) The investigators did not witness any activity on the third day. (Investigation Report, R. at UACL00183-00182.)

On December 14, 2000, Dr. Robert Buchanan, a psychiatric consultant for Unum, conducted a file review and concluded that "there is an indication of significant impairment from depression particularly as it would relate to having the energy, memory, and cognitive ability to be a sales manager." (Defs.' 56.1(a) ¶ 33; File Review, R. at UACL00252-251.) The following day, Unum notified Plaintiff by letter that his claim for disability benefits had been approved. (Letter from Alisha Avery to William Davis, at UACL 00258.) The letter indicated that a check in the amount of $10,172.44 for the period of disability from July 26, 2000 through November 25, 2000 would be enclosed under separate cover. (Defs.' 56.1(a) ¶ 34; R. at UACL00258.) Thereafter, the letter stated that Plaintiff would receive $2650.00 per month (60% of his basic monthly earnings) so long as he remained eligible.[1] (Id.) The letter further explained that benefits were not payable during the 180-day elimination period that extended from January 28 through July 26, 2000, and that since

---

[1]     Plaintiff's monthly salary at Regal-Beloit was $4,416.67. (Defs.' 56.1(a) ¶ 22.)

his disability had lasted more than five months,[2] Plaintiff must apply for Social Security Disability Insurance (SSDI), with any resulting benefits being deducted from his Unum benefit.[3] (*Id.* ¶¶ 15, 34.) Finally, the letter advised that Plaintiff's eligibility for benefits was capped at a maximum of 24-months because his disability was based on a mental illness. (Defs.' 56.1(a) ¶ 36; Letter from Alisha Avery to William Davis, R. at UACL00254.)

## III. Plaintiff's Second Disability Claim

On April 23, 2001, Plaintiff's psychiatrist, Dr. Elizabeth de sa Peria submitted a functional capacities evaluation and physician's statement to Unum in which she concluded that Plaintiff suffered from depression, anxiety, panic, frequent crying, and concentration and memory problems due to a major depressive disorder. (Defs.' 56.1(a) ¶¶ 40-41.) Dr. de sa Peria also listed diabetes and childhood polio as secondary conditions contributing to Plaintiff's disability. (Long Term Disability Claim: Physician's Statement, R. at UACL00276.) Subsequently, on May 28 and June 15, 2001, Plaintiff wrote to Unum and stated that Dr. Steven Myers and Dr. Michael Raymond had conducted examinations and concluded that he suffered from independent physical disabilities. (Pl.'s 56.1(a) ¶ 41.) In a subsequent letter, Dr. Myers concluded:

> Mr. Davis has lumbar spinal stenosis superimposed upon his polio. He also appears to have suffered a small stroke in December 2000 with some mild residual right-sided weakness. While any one of these particular problems may not be terribly disabling, I believe the combination of the three has resulted in permanent disability. Mr. Davis cannot stand or walk for any distance and has significant lower extremity weakness. I believe that he is presently disabled from the lumbar spinal stenosis and the polio.

(R. at UACL00306.) Dr. Raymond's report is nearly illegible, but it mentions stenosis,[4] sleep

---

[2]     Under the Social Security Guidelines, a claimant must be disabled for five full consecutive calender months before becoming eligible for SSDI benefits. (Letter from Social Security Administration to William Davis, dated Nov. 12, 2000, R. at UACL00265.)

[3]     In a letter dated January 16, 2001, Plaintiff advised Unum that he had been awarded monthly SSDI benefits of $1,487.00 retroactive to July 2000. (Defs.' 56.1(a) ¶ 37.) The letter does not indicate the nature of Plaintiff's disability.

[4]     Spinal stenosis is the narrowing of the spinal canal. Symptoms can include pain and
(continued...)

apnea, and post-polio syndrome among its diagnoses. (R. at UACL00314-00312.)

Upon receipt of these letters, Unum directed Kathryn Gregory[5] and Dr. Joseph Thomas, a board-certified orthopedic surgeon employed by Unum, to review Plaintiff's medical records pertaining to his lower back pain and arthritis. Ms. Gregory reviewed Plaintiff's claim and medical records, and submitted a summary to Dr. Thomas for comment. In a two-paragraph memorandum dated August 13, 2001, Dr. Thomas concluded that although Plaintiff suffers from weakness and loss of reflex, he does not have a "significant impairment that would affect claimant in regards to work as a salesman or sales manager." (Defs.' 56.1(a) ¶¶ 44-45; CRS Response, R. at UACL00359.) Dr. Thomas also indicated that he believed Plaintiff's condition to be relatively stable and that rapid deterioration is not expected. (Id.) Dr. Thomas did not address Dr. Meyers's conclusion that Plaintiff was disabled and unable to stand or walk for any distance, nor the basis for his conclusion that Plaintiff could work as a salesman. Dr. Thomas did not examine Plaintiff, nor attempt to contact either of Plaintiff's treating physicians regarding their examinations or diagnoses.

Thereafter, Shirley Yeager[6] reviewed Plaintiff's medical records to determine whether a diagnoses of diabetes and hypertension would support restrictions and limitations on Plaintiff's ability to work. (Defs ' 56.1(a) ¶ 46; Clinical Review Request, R. at UACL00381-00379.) Yeager reviewed the diagnostic testing in the records, including an MRI of the head, CT scan of the brain, carotid dopplers, echo EKG. EEG and sleep apnea studies, and concluded that all were normal

---

[4](...continued)
difficulty walking, numbness, weakness in legs, clumsiness and frequent falling. See http://www.spinenet.com/stenosis.htm.

[5] Defendants identify Gregory as a "orthopedic registered nurse" in their 56.1(a) statement, but fail to cite to any evidence in the record identifying her position or qualifications.

[6] Defendants state in their 56.1(a) statements that Yeager is a registered nurse, but there is no evidence in the record as to her position or qualifications.

except for the sleep study and EEG.[7] The sleep study supported the need for a C-PAP,[8] which Plaintiff uses at night, and the EEG was "mildly abnormal." (Id.) Yeager also noted that Plaintiff was on insulin for diabetes, which appeared well controlled. (Id.) Finally, Ms. Yeager noted that both Dr. Levy and Dr. Reich had indicated (in 2000) that depression was causing Plaintiff's symptoms and that his medical records do not support his claimed physical disability. (Id.)

Dr. Steven Feagin also reviewed Plaintiff's medical records on behalf of Unum. Dr. Feagin agreed that Plaintiff's diabetes, hypertension, and cardiovascular condition do not support employment restrictions. (Defs.' 56.1(a) ¶ 47; Physician Response, R. at UACL00378.) After noting that the electro diagnostic study showed no active denervation to suggest post-polio syndrome,[9] Dr. Feagin concluded that Plaintiff does not suffer from post-polio syndrome, but rather has stable old polio effects. (Id.) In support of this conclusion, he also noted that "claimant had polio [at] age seven and [had] worked with the polio defects" his entire life. (Id.) Dr. Feagin did not discuss Dr. Myers's and Raymond's spinal stenosis diagnosis.

On December 6, 2001, Debra Hansen, a Unum employee who holds the title of Customer Care Specialist, informed Plaintiff that his monthly benefits would cease on July 25, 2002, pursuant to the Unum Policy's 24-month benefit period limit for mental disabilities. (Letter from Debra Hansen to William Davis, dated Dec. 6, 2001, R. at UACL00387-00385.) On January 16, 2002, Plaintiff appealed Unum's decision to deny his application for continued disability benefits based

---

[7]     Obstructive sleep apnea is caused by the blockage of the airway during sleep. Untreated, it can cause high blood pressure and other cardiovascular disease, memory problems, weight gain, impotency, and headaches. See http://www.sleepapnea.org/.

[8]     A nasal C-PAP (Continuous Positive Airway Pressure) delivers air into a sleeping person's airway through a specially designed mask or pillow. It is designed to alleviate snoring and obstructive sleep apnea. See http://www.entnet.org/healthinfo/snoring/cpap.cfm.

[9]     Post-polio syndrome is a condition that can strike polio survivors ten to forty years after recovery from their initial bout with the disease. It is characterized by a weakening of the muscles that were previously injured by the polio virus. Symptoms include "fatigue, slowly progressive muscle weakness, muscle and joint pain, and muscular atrophy." See http://www.ppsr.com/.

on his claimed physical disabilities. (Defs.' 56.1(a) ¶ 49.)

On April 18, 2002, Plaintiff's psychiatrist, Dr. Alan Miller, provided a functional capacity evaluation and mental status supplemental questionnaire in which he reported that Plaintiff "remains chronically depressed with social withdrawal, impaired concentration, impaired memory, [and] difficulty with decision making." (R. at UACL00397.) In light of these symptoms, Dr. Miller concluded that Plaintiff is "chronically disabled from his mental disorder." (Id.)

In a letter dated June 4, 2002, Plaintiff, through counsel, submitted additional medical records in support of his claim for benefits on the basis of a physical disability. (Pl.'s 56.1(a) ¶ 23; Letter from Mark DeBofsky to Debra Hansen, R. at UACL00595-00593.) In addition to Dr. Miller's diagnosis, the letter highlighted Plaintiff's admission to the Rush North Shore Medical Center on September 25, 2001, after an echocardiogram reported an inferior wall abnormality. (R. at UACL00594.) During this visit, Dr. Raymond presented diagnoses of coronary artery disease, diabetes mellitus, anticardiolipin antibody syndrome, sleep apnea, spinal stenosis, and poliomyelitis. (Id.) In light of these ailments, Dr. Raymond concluded that Plaintiff cannot "lift, bend, carry, walk, [and] climb" and that he expected no improvement in Plaintiff's condition. (R. at UACL00591.) In addition, the letter again referenced Dr. Myers' August 2001 diagnosis of spinal stenosis. (R. at UACL00594.)

Dr. Feagin again reviewed the medical records and concluded in a single sentence that his prior conclusions remained unchanged on July 12, 2002. (Id. at UACL00596.) Dr. Thomas further reviewed the file on behalf of Unum in September 2002, concluding that although the diagnosis for spinal stenosis was supported, Plaintiff should be able to perform the type of position that he filled at Regal-Beloit. (Id. at UACL00610.) Unum denied this second claim in a letter dated December 12, 2002 on the basis that there was no "clear evidence that all of [Plaintiff's] non-psychiatric conditions caused impairment to a degree that would preclude performance of sedentary level activities." (Id. at UACL00636-00633.) Again, neither doctor discussed the conclusions of Plaintiff's treating physicians that he was disabled and had difficulty walking, nor their basis for

9

concluding otherwise.

On September 27, 2002, Dr. David Goldsmith, a clinical psychologist, reviewed the file from a psychiatrist and neurocognitive standpoint on Unum's behalf.[10] (Defs.' 56.1(a) ¶ 55.) Dr. Goldsmith focused on suggestions that Plaintiff suffered from dementia, noting that the file contained no evidence that Plaintiff's neurocognitive functioning had been formally assessed since Dr. Levy's report in April 2000, when Dr. Barras concluded that Plaintiff's "difficulty with concentration, forgetfulness, and indecisiveness are primarily due to his mood disorder." (R. at UACL00622.) In light of this, Dr. Goldsmith decided that "suggestions that his neurocognitive problems have progressed or that the insured's mental processing is currently impaired by organic, non-psychiatric problems have not been supported with clinical evidence." (Id. at UACL00621.) Dr. Goldsmith concluded that a diagnosis of dementia was unsupported by Plaintiff's medical records. (Id.)

Unum also directed Kelly Marsiano, a vocational rehabilitation consultant, to review the file and conduct a transferable skills analysis ("TSA") based upon Plaintiff's education, training, and job experience. Ms. Marsiano limited her analysis to those positions in the "sedentary or possibly light level," and consider Dr. Thomas's conclusion that "prolonged walking or standing may not be tolerated." (R. at UACL00619.) In light of Plaintiff's "strong work history" and "stabilized medical conditions," Marsiano concluded that Plaintiff would qualify for the positions of training manager, sales product manager, and plant supervisor, all of which had salaries within the definition of "gainful employment under the Unum Policy."[11] (Id. at UACL00617.)

---

[10]     It is not clear why Unum was investigating Plaintiff's mental state or possible dementia in September 2002, as his 24-month limit on coverage for mental disability had already expired. Moreover, as Dr. Goldsmith noted, there had been no indications that Plaintiff suffered from dementia since April 2000, at which time Dr. Levy conducted the last neurocognitive assessment of Plaintiff. (R. at UACL00622.)

[11]     The CBA does not expressly define "gainful employment," but it does provide that after 24 months of payments, disability payments will cease if the recipient's monthly earnings exceed the gross disability payment. (R. at UACL00748.) During the first 24 months, disability
(continued...)

10 at UACL00748

Subsequently, in November 2002, Dr. George Fluter, a board-certified doctor in physical medicine and rehabilitation, reviewed Plaintiff's records to assess his claimed physical disabilities. Dr. Fluter found evidence of "diffuse weakness of both lower extremities" including use of an assistive aid in walking, and mild to moderate spinal stenosis. (R. at UACL00628.) After analyzing Plaintiff's electrodiagnostic studies done in March 2001, Dr. Fluter concluded that there was no denervation[12] to suggest post-polio syndrome. (Id.) After reviewing Plaintiff's medical records, Dr. Fluter concluded that although Plaintiff suffers from a number of medical problems, "there does not appear to be clear evidence that all of the non-psychiatric conditions cause impairment to a degree that would preclude performance of sedentary level activities." (Id.) Dr. Fluter made no reference to the reports of Plaintiff's treating physicians, nor did he discuss his reasons for rejecting their conclusions that Plaintiff was disabled.

By letter dated December 12, 2002, Unum Customer Care Specialist Debra Hanson notified Plaintiff's attorney that his benefit period under the mental illness limitation expired on July 25, 2002. (R. at UACL00636.) The letter explained that after 24 months of payment, Plaintiff is no longer eligible for coverage unless Unum determines that he is unable to perform any gainful employment for which he is reasonable fitted. (Id.) Hanson explained that Unum representatives had evaluated his claim for continued benefits pursuant to his physical conditions, and concluded that although the diagnosis of spinal stenosis is supported, "the implication that the claimant could not perform in at least the sedentary level is not supported. Treatment should be directed toward maintaining activity, weight loss, non-steroidal medication, and possibly physical therapy on an episodic basis." (Id.)

---

[11](...continued)
payments will continue so long as the recipient's monthly earnings do not exceed 80% of his or her indexed monthly earnings. (Id.)

[12]      Denervation is a medical term referring to loss of nerve supply. Denervation may be caused by illness (such as polio), chemicals, or physical injury. See http://www.talkmedical.com/medical-dictionary/3891/Denervation.

## IV.    Appeal of Denial of Physical Disability Claim

On January 12, 2003, Plaintiff, through counsel, submitted notice of appeal of Unum's denial of benefits based on his physical disability. (Pl.'s 56.1(a) ¶ 28; R. at 00638-00627.) In support of his appeal, Plaintiff submitted a statement from Dr. Raymond regarding his physical disabilities. In his statement, Dr. Raymond stated that Plaintiff suffers from "significant" physical disabilities, including diabetes mellitus, anticardiolipin antibody syndrome, transient ischemia attack, coronary artery disease, sleep apnea, lumbar spinal stenosis, carpal tunnel syndrome, prostate cancer, and post-polio syndrome. (Letter from Michael Raymond to Steven Jackson, dated May 19, 2003, R. at UACL00659-00658.) Dr. Raymond concluded that Plaintiff was disabled due to cumulative effect of these multiple impairments:

> As the sum total of the above conditions, I have found Mr. Davis to be significantly impacted on a purely physical basis. He ambulates with the assistance of a wheeled walker due to a combination of leg weakness from postpolio syndrome and pain from spinal stenosis. These conditions make it difficult, if not impossible, for Mr. Davis to sit, stand or walk for any prolonged timeframes. He experiences numbness of his hands from carpal tunnel syndrome, which would preclude an excessive amount of writing or activities involving fine manipulative abilities or repetitive type activities. He has most recently had an episode of hypoglycemia in which he was found driving on the wrong side of the street incoherent requiring acute hospitalization, this secondary to his diabetes.

> I have reviewed the Social Security Administration definition of work activities and under that of sedentary work I do not believe Mr. Davis to be able to complete even that, i.e., exerting up to 10 pounds of force occasionally or a negligible amount one-third to two-thirds of the time in activities such as lifting, carrying, pushing, pulling or moving objects. In sum, I do not believe that Mr. Davis is capable of active employment at this time based on the above conditions.

(Id.)

On July 8, 2003, Dr. Fluter reviewed Dr. Raymond's additional statement and concluded that the letter contained "no additional information" regarding Plaintiff's orthopedic and neurological status, and that the contents of the letter were "not sufficient to warrant a change in opinion" from his November 2002 review. (R. at UACL00665.) Thereafter, in a letter dated July 9, 2003, Lead Appeals Specialist Louise Pons advised Plaintiff that Unum representatives had reviewed the additional information attached to his appeal letter and upheld the previous decision to terminate

benefits after 24 months. (R. at UACL00666.)

Not to be deterred, on August 4, 2003, Plaintiff submitted additional documentation regarding hospitalization at Illinois Masonic Hospital from an episode of hypoglycemia in February 2003. (Pl.'s 56.1(a) ¶ 31.) After receiving this information, Dr. Fluter reviewed these records on behalf of Unum. Dr. Fluter noted that the incident was possibly triggered by Plaintiff's failure to eat breakfast on the day of the episode and concluded that "it would be unlikely for the claimant to experience significant hypoglycemia with attention to proper dosing and administration of his diabetic treatment medications and to proper dietary management." (Physician Response, R. at UACL00705.) He further stated his belief that "[t]his occurrence would not preclude performance of sedentary level activities." (*Id.*) In light of this report, Unum advised Plaintiff that his second appeal had been denied in a letter dated August 25, 2003. (Pl.'s 56.1(a) ¶ 32; Letter from Louise Pons to William Davis, dated Aug. 25, 2003, R. at UACL00714.) The letter further advised Plaintiff that his administrative remedies had been exhausted with this second appeal. (Defs.' 56.1(a) ¶ 67; R. at UACL00716.)

## V.    Procedural History

After Unum denied his final appeal, Plaintiff filed the instant action on September 9, 2003, alleging that Unum wrongfully denied his claim for disability benefits in violation of ERISA, 29 U.S.C. § 1132(a)(1)(B). The parties have now filed cross-motions for summary judgment.

## DISCUSSION

The parties raise two issues in their respective motions for summary judgment. First, the parties dispute the applicable standard of review of Unum's denial of disability benefits. Second, the parties dispute the propriety of Unum's denial of Plaintiff's claim for continued disability benefits.

## I.    Summary Judgment Standard

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

13

of law." FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A genuine

issue of material fact exists where "the evidence is such that a reasonable jury could return a

verdict for the nonmoving party," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), when

a court views the record and all reasonable inferences drawn from it in a light most favorable to the

nonmoving party. *Id.* at 255; *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). "If no genuine

issue of material fact exists, the sole question is whether the moving party is entitled to judgment

as a matter of law." *Logan v. Commercial Union Ins. Co.*, 96 F.3d 971, 978 (7th Cir. 1996), *citing*

*Miranda v. Wisconsin Power & Light Co.*, 92 F.3d 1011, 1014 (7th Cir. 1996).

## II.     ERISA Standard of Review

Congress enacted ERISA "to promote the interests of employees and their beneficiaries in

employee benefit plans, and to protect contractually defined benefits." *Black & Decker Disability*

*Plan v. Nord*, 538 U.S. 822, 830 (2003); *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 113

(1989). Section 1132(a)(1)(B) allows a participant in or beneficiary of a covered plan to sue "to

recover benefits due to him under the terms of his plan." 29 U.S.C. § 1132(a)(1)(B). Under ERISA,

the standard of review for benefit determinations hinges on whether the plan administrator has

been granted discretion in making the benefit determination. *Bruch*, 489 U.S. at 115. Generally,

courts review benefit determinations under ERISA on a *de novo* standard. *Id.* Where a benefit

plan gives the administrator discretionary authority to determine benefits eligibility, however, the

decision will be reviewed under an arbitrary and capricious standard. *Id.* at 111.

When deciding whether a benefit plan confers discretion on the plan administrator, courts

review the language of the plan *de novo*. *Ramsey v. Hercules*, 77 F.3d 199, 205 (7th Cir. 1996),

*citing Bechtold v. Physicians Health Plan of Northern Indiana, Inc.*, 19 F.3d 322, 325 (7th Cir.

1994). A grant of discretion must be clear and will not be assumed. *Herzberger v. Standard Ins.*

*Co.*, 205 F.3d 327, 331 (7th Cir. 2000) ("An ERISA plan can likewise specify that the administrator

has discretion in interpreting or applying it . . . but the conferral of such discretion is not the be

assumed."). In *Herzberger*, the Seventh Circuit created "safe harbor" language through which an

14

ERISA plan will be conclusively read as granting discretion in the plan administrator. *Id.* at 331. The safe harbor language, which reads "Benefits under this plan will be paid only if the plan administrator decides in his discretion that the applicant is entitled to them," is not mandatory. *Id.* Nevertheless, language purporting to convey discretion in the administrator must indicate with "clarity that a discretionary determination is envisaged." *Id.* The court specifically cautioned that the presumption of *de novo* review is not rebutted by language stating that "benefits will be paid only if the plan administrator determines they are due, or only if the applicant submits satisfactory proof of his entitlement to them." *Id.*

In the present case, the Unum Policy states that "[w]hen making a benefit determination under the policy, Unum has discretionary authority to determine your eligibility for benefits and to interpret the terms and provisions of the policy." (R. at UACL00462.) Given this clear statement of discretionary authority, Defendants maintain that the court should apply the arbitrary and capricious standard in reviewing Unum's denial of Plaintiff's claim. Relying on *Bolden v. Unum Life Ins. Co. of America*, No. 02 C 6701, 2003 WL 921764, (N.D. Ill. Mar. 6, 2003), however, Plaintiff contends that the Unum Policy does not clearly convey discretionary authority to the plan administrator. In *Bolden*, Judge Leinenweber concluded that a Unum disability policy did not contain a clear grant of discretionary authority to determine benefits eligibility. Specifically, the court noted that although the plan's Certificate of Coverage stated that Unum had discretionary authority to determine benefits eligibility and to interpret the terms and provisions under the act, the policy itself states that an employee is disabled when "Unum determines." *Id.* at *3. The court concluded that while the former language was sufficient under *Herzberger*, the latter language within the policy was "clearly insufficient." *Id.* After concluding that these provisions were inconsistent, Judge Leinenweber applied the provision in the Certificate of Coverage stating "if the terms and provisions of the certificate of coverage (issued to you) are different from the policy (issued to the policyholder), the policy will govern," and held that the default *de novo* standard should be applied. *Id.*

Although this plan contains the same linguistic discrepancy discussed in *Bolden*, this court is not convinced that the two provisions are inconsistent. As an initial matter, the first page of the policy states "[t]his policy consists of: (1) all policy provisions and any amendments and/or attachments issued; (2) employee's signed applications, and (3) the certificate of coverage." (R. at UACL00473.) Thus, the Certificate of Coverage is not distinct from the rest of the policy, but rather a part of it, and its provisions must be read as a part of the whole policy. It is only where "the terms and provisions of the certificate of coverage (issued to you) are different from the policy (issued to the policyholder)" that the terms of the latter will govern. (R. at UACL00462.) Here, the provisions of the Certificate are not "different," but merely supplemental.

The *Bolden* court notes that the language in "General Provisions" section of the policy, which states "you are disabled when Unum *determines that* . . . you are unable to perform the duties of any gainful occupation for which you are reasonable fitted by education, training or experience," (R. at UACL00458), is insufficient under *Herzberger* to rebut the presumption of plenary review. This court agrees with this conclusion. A determination that specific language is insufficient to rebut the default presumption does not require the conclusion that benefits determinations shall be reviewed on a *de novo* basis, however. Had the language in the General Provisions section stated affirmatively that benefit decisions were entitled to no discretion, the court would have no trouble concluding that the provision in the Certificate of Coverage is inconsistent and thus does not apply. In this case, however, the court reads the language in the Certificate as supplemental clarifying language that does not contradict any of the policy's general provisions (which, standing alone, are silent on the issue of standard of review), but merely seeks to explain them in "plain English." (R. at UACL00462). This is consistent with a decision of Magistrate Judge Denlow, who concluded that a Unum disability plan granted the administrator "the *discretion to determine* whether an applicant is disabled." *Crespo v. Unum Life Ins. Co. of America*, 294 F. Supp. 2d 980, 990 n.3 (N.D. Ill. 2003).

More importantly, the Seventh Circuit recently held that certificates of coverage are binding

insurance plan documents. *Ruiz v. Continental Cas. Co.*, __ F.3d __, 2005 WL 566731 (7th Cir. Mar. 11, 2005). In *Ruiz*, the court examined whether a disability insurance plan granted the plan administrator discretionary authority to construe the term of the plan or determine eligibility for benefits. *Id.* at *4. The plan in question contained, like the Unum Plan, discretionary language within its certificate of coverage, but not in the body of the policy. *Id.* Regardless, the court held that a certificate of coverage is a plan documents, and thus that the language within the certificate was sufficient to confer discretionary authority on the plan administrator. *Id.* at *5.

In concluding that the Unum Policy vests discretion in the administrator, the court is mindful that the purpose of the *Herzberger* decision is to ensure that employee policyholders are given adequate notice of plan administrator's benefit determinations will be "largely insulated from judicial review by reason of being discretionary." *Herzberger*, 205 F.3d at 332. Under ERISA, a stipulation for deferential review "must be clear. . . . The employees are entitled to know what they're getting into, and so if the employer is going to reserve a broad, unchanneled discretion to deny claims, the employees should be told about this. and told clearly." *Id.* at 332-33. For the reasons explained above, the court finds that the combined language of the Certificate of Coverage and the General Provisions sections of the Unum Policy does clearly inform Plaintiff of Unum's discretion.[13]

Plaintiff also argues, in the alternative, that Unum has a conflict of interest as both the claims administrator and the insurer. *Beecher v. Connecticut General Life Ins. Co.*, No. 01 C 7741, 2002 WL 31681473. *2 (N.D. Ill. Nov. 26, 2002) (recognizing that company has a conflict of interest

---

[13]     A number of other Judges in this district have also concluded that this language was sufficient to convey discretionary authority to Unum. *See Shyman v. Unum Life Ins. Co. of America*, No. 01 C 7366, 2004 WL 609280, *7 (N.D. Ill. Mar. 25, 2004) (Gottschall, J.); *Cheng v. Unum Life Ins. Co. of America*, 291 F. Supp. 2d 717, 719 (N.D. Ill. 2003) (Bucklo, J.); *Gingold v. Unum Life Ins. Co. of America*, No. 01 C 5420, 2002 WL 31307853, *4 (N.D. Ill. Oct. 15, 2002) (Aspen, J.), *aff'd*, 74 Fed. Appx. 660. 2003 WL 22025061 (7th Cir. 2003). The court cannot know, however, whether the policies at issue in these cases all contained identical language and terms as the policy at issue here, though they did all involve a Unum Long Term Disability Policy with the identical "discretionary authority" provision. It should also be noted that in many of these cases the plaintiffs do not appear to have argued that the language in the certificate of coverage was inconsistent with that in the general policy provisions, but rather objected to the application of an arbitrary and capricious standard on other, if any, grounds.

17

where serving as both claims administrator and the insurer). Such a conflict is considered as a factor when determining whether the administrator acted arbitrary and capriciously, *Hightshue v. AIG Life Ins. Co.*, 135 F.3d 1144, 1148 (7th Cir. 1998), but the Seventh Circuit has rejected the argument that the inherent conflict of interest is sufficient to alter the standard of review. *Mers*, 144 F.3d at 1120. Instead, courts presume that an administrator acts neutrally "unless a claimant shows by providing specific evidence of actual bias that there is a significant conflict." *Id., citing Cuddington v. Northern Ind. Public Serv. Co.*, 33 F.3d 813, 816 (7th Cir. 1994); *Van Boxel v. Journal Co. Employees' Pension Trust*, 836 F.2d 1048, 1051, 1053 (7th Cir. 1987). Plaintiff in this case has not presented any such evidence.

Under the arbitrary and capricious standard, an administrator's denial of benefits "will only be overturned if it is 'downright unreasonable.'" *Carr v. Gates Health Care Plan*, 195 F.3d 292, 294 (7th Cir. 1999), *quoting Butler v. Encyclopedia Britannica, Inc.*, 41 F.3d 285, 291 (7th Cir. 1994). In other words, an administrator's decision is final so long as the administrator "makes an informed judgment and articulates an explanation for it that is satisfactory in light of the relevant facts," *Id.*, and a denial of benefits will not be set aside if based upon "a reasonable interpretation of plan documents." *Id., citing Loyola Univ. of Chicago v. Humana Ins. Co.*, 996 F.2d 895, 898 (7th Cir. 1993). Thus, in applying the arbitrary and capricious standard, it is not the function of the courts "to decide whether we would reach the same conclusion as the Plan or even rely on the same authority," but rather merely to determine whether the decision was "downright unreasonable." *Carr*, 195 F.3d at 294-95, *quoting Cvelbar v. CBI Ill. Inc.*, 106 F.3d 1368, 1379 (7th Cir. 1997); *Mers v. Marriot Int'l Group Accidental Death & Dismemberment Plan*, 144 F.3d 1014, 1021 (7th Cir. 1998). Nevertheless, "[d]eferential review is not no review," and "deference need not be abject." *Gallo v. Amoco Corp.*, 102 F.3d 918, 922 (7th Cir. 1996); *Swaback v. American Info. Tech. Corp.*, 103 F.3d 535, 540 (7th Cir. 1996) ("Although we review the [plan administrator's] actions in a deferential light, we shall not rubber stamp their decisions.").

Despite the deference accorded an insurer's denial under this standard, an administrator's

discretion is not unlimited. ERISA requires a "full and fair" assessment of claims and clear communication to the claimant of the "specific reasons" for benefits denials. 29 U.S.C. § 1133; 29 C.F.R. § 2560.503-1. Thus, a benefits denial will be overturned if it is unreasonable or if the administrator fails to afford the claimant a "full and fair review." *See Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 919 (7th Cir. 2003) (reversing denial of long-term disability claim based on fibromyalgia under discretionary standard); *Crespo*, 294 F. Supp. 2d at 994.

## III.    Unum's Denial of Claim

Notwithstanding the deference granted Unum's decision, the court remains uncertain that the decision is supported by the record. Unum based its denial of benefits on the grounds that despite Plaintiff's ailments, there was no evidence that he could not perform sedentary level work. In reaching its decision, however, it appears that Unum (1) relied on the conclusory and unsupported opinions of in-house doctors who had not examined Plaintiff; (2) relied on opinions of in-house doctors who had not examined plaintiff and who did not explain their basis for disagreement with the conclusions reached by Plaintiff's treating physicians; (3) failed to contact Plaintiff's treating physicians to discuss their diagnoses; (4) failed to refer Plaintiff to an independent medical expert for examination; and (5) ignored (or at least made no mention of) evidence and reports presented by Plaintiff's treating physicians. Although courts have held that these factors individually do not require a finding that Unum's decision was arbitrary and capricious, the combination of these factors here leads the court to conclude that Unum failed to conduct a full and fair review of Plaintiff's disability claim.

Unum based its denial of benefits on the ground that, despite Plaintiff's ailments, there was no evidence that he could not perform sedentary level work. In reaching this conclusion, however, Unum dismissed the reports of two of Plaintiff's treating physicians that Plaintiff was disabled due to the cumulative effects of a number of ailments, and repeatedly ignored evidence of Plaintiff's

19

deteriorating physical condition.[14]  In support of his original claim for disability benefits based on his physical disability, Plaintiff submitted reports in May and June 2001 from Drs. Myers and Raymond stating that he suffered from spinal stenosis. Specifically, Dr. Myers concluded that the combination of Plaintiff's spinal stenosis and his polio "has resulted in permanent disability." (R. at UACL00306.)  Dr. Myers also noted that "cannot stand or walk for any distance and has significant lower extremity weakness." (Id.) Dr. Raymond similarly concluded that Plaintiff suffered from spinal stenosis, sleep apnea, and post-polio syndrome. (R. at UCAL00314-00312.)  Upon receipt of these reports, one of Unum's in-house consultants, Dr. Thomas, concluded that although there "are objective findings of weakness and loss of reflex," Plaintiff does not have a "significant impairment that would affect claimant in regards to work as a salesman or sales manager." (R. at UACL00359.)  Although Dr. Thomas briefly mentioned the results of an EMG test, he did not explain his conclusion that Plaintiff was not disabled, nor did he discuss the basis for his disagreement with Dr. Myers's and Raymond's diagnosis.

Similarly, Dr. Feagin reviewed the reports submitted by Plaintiff and concluded that Plaintiff did not suffer from post-polio syndrome and that he was not disabled. (R. at UACL00378.)  While Dr. Feagin cited the "electromagnetic studies" which showed no "active denervation" for his conclusion that Plaintiff did not suffer from post-polio syndrome, he did not explain his reasons for concluding that Plaintiff could work, nor did he even mention Dr. Myers's report. (Id.)  The only explanation provided by Dr. Feagin was that Plaintiff had contracted polio at age seven and had worked his entire life with the lingering symptoms. (R. at UACL00378.)  In the court's view, this

---

[14]  Plaintiff also contends that Unum failed to properly consider the Social Security Administration's finding of disability on July 16, 2001. For purposes of this case, however, the SSDI award is not helpful because the award letter does not specify whether the approval or Plaintiff's application was based on a mental and/or physical disability. Unum does not here challenge the Plaintiff's claim of mental disability. Moreover, the Social Security file was not presented to Unum, and thus could not have been considered during its benefits determination. See Donato v. Metropolitan Life Ins. Co., 19 F.3d 375, 380 (7th Cir. 1994) (plan administrator did not err in failing to consider Social Security Administration determinations where Social Security file had not been presented to plan administrator, because the administration "was bound only to consider what evidence and information it had before it").

statement shows that Dr. Feagin failed to appreciate or consider the multiple impairments —
"stenosis superimposed on polio" – that were the basis for Dr. Myers's conclusion that Plaintiff was
disabled. Indeed, none of Unum's reviewing professionals attempted to explain their bases for not
accepting Dr. Myers's diagnosis at face value. Nor did any of Unum's medical professionals
discuss Dr. Myers's statement that Plaintiff "cannot stand or walk for any distance" and suffers from
"significant lower extremity weakness," (R. at UACL00306), or attempt to explain why this diagnosis
was or was not accurate. Instead, the Unum reports provide one-sentence statements that
whatever Plaintiff's physical problems, he can work.

Dr. Raymond submitted an additional report in May 2002 in which he concluded that Plaintiff
was disabled due to a combination of post-polio syndrome, stroke, coronary heart disease,
diabetes, and anticardiolipin antibody syndrome. (R. at UACL00591.) In his supporting statement,
Dr. Raymond stated that Plaintiff could not "lift, bend, carry, walk, [or] climb" and that he anticipated
no improvement in Plaintiff's condition. (Id.) Dr. Feagin reviewed this new report on behalf of
Unum, concluding without explanation that his "[p]rior conclusions remained unchanged." (R. at
UACL00596.) Again, Dr. Feagin did not discuss Dr. Raymond's conclusion that Plaintiff was
disabled and unable to walk without assistance, nor offer any explanation of his reasons for
concluding otherwise.

The administrative record reflects a pattern in which Unum doctors briefly discuss the
medical testing (in a sentence or two), and then conclude "but Plaintiff's impairments do not render
him physically unable to perform sedentary work." At no point do they attempt to explain their own
conclusions or their basis for disagreeing with the conclusions of Plaintiff's treating physicians. The
failure of Unum's doctors to articulate their reasons for rejecting the conclusions of Plaintiff's
treating physicians leave the reviewing court with little or no basis for evaluation their decision to
deny Plaintiff's claim. See Carr, 195 F.3d at 294 (Under the arbitrary and capricious standard, an
administrator's decision is final so long as he "makes an informed judgment and articulates an
explanation for it that is satisfactory in light of the relevant facts.").

21

The conclusory opinions offered by Unum's in-house doctors are especially troubling in light of the fact that Unum's doctors neither examined Plaintiff nor spoke with his treating physicians. Under ERISA, there is no "treating physician rule" that requires plan administrators to grant special weight to the opinions of a claimant's treating physician. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003). Nevertheless, a plan administrator "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Id.* In *Nord*, a physician hired by the plan administrator examined an individual claiming disability. Contrary to the findings of the claimant's treating physician, the plan administrator's doctor concluded that the claimant could perform sedentary work with the aid of medication. The Supreme Court held that the plan administrator need not give more weight to the findings of the claimant's treating physician than those of doctors hired by the plan. Importantly, however, the plan administrator relied on the opinions of an independent outside consultant, who personally examined the claimant. In contrast, Unum has not had Plaintiff examined by its own physician, nor has it relied on independent consultants. Rather, Unum has merely had its own in-house physicians conduct a paper review of Plaintiff's file.

Although plan administrators are not required to seek independent medical evaluations, *Wallace v. Reliance Standard Life Ins. Co.*, 318 F.3d 723, 724 (7th Cir. 2003), courts have repeatedly held that such an independent evaluation is evidence of a thorough investigation of a claim. *Hightshue v. AIG Life Ins. Co.*, 135 F.3d 1144, 1148 (7th Cir. 2003) ("Seeking independent expert advice is evidence of a thorough investigation"); *Crespo v. Unum Life Ins. Co.*, 294 F. Supp. 2d 980, 995 (N.D. Ill. 2003) ("Seeking independent expert advice is evidence of a thorough investigation, and reliance upon independent experts generally insulates the fiduciary from judicial reversal."). Courts have also been critical where plan administrators fail to attempt to contact treating physicians to discuss any concerns they might have regarding a claimed disability. *Crespo*, 294 F. Supp. 2d at 994 ("Unum did not make a full and fair assessment of [plaintiff's] claims because it did not contact any of her treating physicians to discuss its concerns.");

22

*Dipietro v. Prudential Ins. Co.*, No. 03 C 1018, 2004 WL 626818, *7 (N.D. Ill. Mar. 26, 2004) (reversing insurer's denial of benefits under arbitrary and capricious standard of review where there had been no independent medical examination and insurer's consultants had not spoken with claimant's treating physicians). Indeed, this court has found no case within the Seventh Circuit in which a court upheld a claims denial where the claimant's treating physicians all agreed[15] he was disabled and in which the plan administrator did not (1) examine Plaintiff, (2) refer Plaintiff to an independent medical expert for examination, nor (3) have its in-house physicians at least contact the claimant's treating physicians. In the absence of any such steps, or of a full explanation for rejecting the conclusions of Plaintiff's treating physicians and concluding that Plaintiff was not disabled, the court is uncertina whether the plan administrator simply denied the claim as a matter of course.

As Plaintiff points out, Unum's review of his claim resembles that found to be arbitrary and capricious in *Crespo v. Unum Life Ins. Co.*, 294 F. Supp. 2d 980 (N.D. Ill. 2003). In *Crespo*, plaintiff submitted a claim for disability claimants on the basis of fibromyalgia, "a common, but elusive and mysterious disease . . . [causing] 'pain all over,' fatigue, disturbed sleep, stiffness, and . . . multiple tender spots." *Crespo*, 294 F. Supp. 2d at 983. In support of her claim, plaintiff submitted reports from a number of treating physicians who concluded that she was disabled and unable to work due to the disease. *Id.* at 984-87. Unum rejected plaintiff's claim after an in-house nurse and doctor reviewed plaintiff's file and concluded that there was no evidence that plaintiff could not work. *Id.*

---

[15]    Defendants now maintain that one of Plaintiff's treating physician, neurologist Dr. Levy, concluded that Plaintiffs problems stemmed entirely from psychiatric problems. (Defendants' Reply Brief, at 9.) While it is true that Dr. Levy concluded that "depression is causing his symptoms," this diagnosis was made in May 2000. There is much evidence that since that time, Plaintiff's physical condition has deteriorated. Indeed, Dr. Levy examined Plaintiff a full year before Plaintiff was diagnosed with spinal stenosis and post-polio syndrome by Drs. Myers and Raymond. The fact that Unum continues to cite Dr. Levy's four-year old comment shows that it has failed to consider the substantial evidence that Plaintiff's condition has significantly deteriorated since his initial claim in 2000. In any case, although the plan does not provide for disability benefits for a mental disability that exceeds 24 months in duration, the plan does not appear to exclude coverage for physical disabilities merely because a mental condition is the root cause of the physical problems.

23

at 987. At no point did Unum's doctors attempt to contact plaintiff's treating physicians. *Id.* Reviewing the denial under the arbitrary and capricious standard, Magistrate Judge Denlow concluded that the insurer's claims investigation was lacking in a number of areas. Among the errors made by Unum, Judge Denlow noted that the company (1) did not consider the reports submitted by two of plaintiff's treating physicians, (2) failed to contact any of plaintiff's treating physicians to discuss its concerns; and (3) did not refer plaintiff for an independent examination nor submit her records for an independent examination. *Id.* at 994-96.

Unum's present denial of benefits bears close resemblance to that in *Crespo*. As in *Crespo*, Unum here based its decision entirely on the conclusions of its own in-house doctors who never examined Plaintiff nor made any effort to discuss his condition with his treating physicians. As Judge Denlow noted:

> In light of the reports from [claimant's] treating and consulting physicians, Unum easily could have resolved any doubts it may have had by requiring [claimant] to be examined by an independent medical expert or at a minimum to have her medical records reviewed by an independent medical expert, who could contact her treating physicians to clarify any questions.

*Id.* at 996. Furthermore, in this case, as in *Crespo*, Unum failed to consider all medical evidence submitted by Plaintiff. Specifically, Unum both failed to consider the cumulative effect of Plaintiff's multiple physical impairments and failed to consider certain impairments discussed by his treating physicians. After Unum's initial denial of his claim, Plaintiff submitted additional materials in support of his disability claim. These reports discussed additional physical impairments not previously examined by Unum. Specifically, during his appeal, Plaintiff submitted a letter from Dr. Raymond specifying that the combined effect of his multiple impairments rendered him disabled. Dr. Raymond listed a total of ten impairments – including diabetes, lumbar spinal stenosis, carpal tunnel syndrome, post-polio syndrome, and sleep apnea – and concluded that the cumulative effect of these impairments rendered him disabled. (R. at UACL00658-00659.) In rejecting this appeal, Dr. Fluter, one of Unum's in-house physicians, stated that Dr. Raymond's letter contained "no additional information regarding claimant's orthopedic and neurologic status." (R. at UACL00665.)

24

Yet, Unum had not yet considered the carpal tunnel diagnosis, as required for a full and fair review. Such a review, under ERISA regulations "takes into account all comments, documents, records, and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination." 29 C.F.R. § 2560.503-1(h)(4); *Crespo*, 294 F. Supp. 2d at 995. None of Unum's in-house doctors ever discussed or examined Dr. Raymond's carpal tunnel diagnosis. In light of this, Dr. Fluter's statement that claimant had submitted "no additional information" is conclusory and insufficient. *See Nord*, 538 U.S. at 823 ("Plan administrators may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician.").

Had Unum referred Plaintiff to an independent medical expert, and had that independent expert concluded that Plaintiff's physical impairments do not render him unable to perform sedentary work, the court would likely have little trouble upholding its denial of benefits. *See Donato v. Metropolitan Life Ins. Co.*, 19 F.3d 375, 380 (7th Cir. 1994) (holding that an insurance company made a permissible choice in relying upon independent medical consultant over claimant's physicians); *Anderson v. Operative Platerers' & Cement Masons' Int'l Ass'n Local No. 12 Pension & Welfare Plans*, 991 F.2d 356, 358 (7th Cir. 1993) (upholding pension fund's denial of benefits where the fund relied upon an examination conducted by an independent orthopedic surgeon). In the absence of an independent examination, however, Unum relies on a mere paper review of Plaintiff's claims, which, under the circumstances presented here, is inadequate.

## IV. Remand

Having concluded that the denial of Plaintiff's disability claim was arbitrary and capricious, the court must determine the appropriate remedy. In the ERISA context, the Seventh Circuit has recognized a distinction between cases dealing with a plan administrator's initial denial of benefits and cases in which a plan administrator terminates benefits to which the administrator had previously determined the claimant was entitled. *Hackett v. Xerox Corp. Long-Term Disability Income Plan*, 315 F.3d 771, 775 (7th Cir. 2003). This distinction seeks to shape the remedy for

the defective procedures in light of the *status quo* prior to the denial or termination. *Id.*, *citing Quinn v. Blue Cross & Blue Shield Ass'n*, 161 F.3d 472 (7th Cir. 1998). Thus, in cases in which the plan administrator did not employ adequate procedures in its initial denial of benefits, the appropriate remedy is to remand the case to the plan administrator. *Hackett*, 315 F.3d at 776, *citing Wolfe v. J.C. Penney Co.*, 710 F.2d 388, 394 (7th Cir. 1983). If the claimant prevails on remand, he would be entitled to retroactive benefits from the time at which the initial denial occurred. *Id.* But the court is not allowed to "substitute its own judgment for that of the administrator," *Hackett*, 315 F.3d at 776, *citing Quinn*, 161 F.3d at 478; *Gallo v. Amoco Corp.*, 102 F.3d 918, 923 (7th Cir. 1996), nor is the claimant "automatically entitled to benefits." *Hackett*, 315 F.3d at 776; *Quinn*, 161 F.3d at 478 (automatic award of benefits would not restore *status quo*, but might provide the claimant "with an economic windfall should she be determined not disabled upon a proper reconsideration").

In cases in which the plan administrator terminated benefits under defective procedures, however, the *status quo* prior to the defective procedure was the continuation of benefits. *Hackett*, 315 F.3d at 476. Thus, the proper remedy upon finding that the plan administrator employed acted arbitrarily and capriciously in terminating benefits is the reinstatement of benefits. *Id; Halpin v. W.W. Grainger, Inc.*, 962 F.2d 685, 697 (7th Cir. 1992) (reinstating benefits after plan administrator had arbitrarily and capriciously terminated benefits). In general, reinstatement is appropriate in cases "involv[ing] claimants who were receiving disability benefits, and, but for their employers' arbitrary and capricious conduct, would have continued to receive benefits." *Quinn*, 161 F.3d at 477; *Hackett*, 315 F.3d at 776.

Although Plaintiff had been receiving disability benefits under the Unum Plan on the basis of a mental disability, the present case involves a benefits denial, not a termination. Prior to his second disability claim, Plaintiff's benefits were scheduled to, and did, expire in July 2002, pursuant to the Unum Plan's 24-month coverage limitation disabilities based on mental illness. Thus, Unum's arbitrary and capricious review involved a denial of Plaintiff's second benefits claim, not

the termination of his initial claim. This distinction is explained in *Quinn*, where the court dealt with an administrator's denial of continuing benefits under a plan in which the benefits automatically expired unless the administrator reviewed an approved a claim for continuance. *Quinn*, 161 F.3d at 477. In finding that the case should be remanded to the plan administrator, the court noted that unlike cases involving a straight termination of benefits, "Quinn was not scheduled to continue receiving benefits under the program." *Id.* at 478.

The Seventh Circuit has held that remand is unnecessary, even under the arbitrary and capricious standard of review, when "the case is so clear cut that it would be unreasonable for the plan administrator to deny the application for benefits on any ground." *Hess v. Hartford Life & Accident Ins. Co.*, 274 F.3d 456, 464 (7th Cir. 2001). The court does not believe that this case falls into that category, however. One unfortunate aspect of Unum's failure to refer Plaintiff for an independent medical examination is that, as the court noted previously, had an independent medical expert examined Plaintiff and concluded that he was physically able to perform sedentary work, a subsequent denial of benefits would likely have been unassailable. This is not a case in which the court "there is no evidence in the record to support a . . . denial of benefits." *Quinn*, 161 F.3d at 477. In their review of the file, Unum's in-house doctors did discuss Plaintiff's medical testing and (implicitly) suggested that the objective results did not indicate that Plaintiff cannot perform sedentary work.

The parties have presented this court with a series of medical reports – some prepared by doctors who examined Plaintiff, others by doctors who, in turn, examined only the treating doctors' reports. Unfortunately, the two sets of doctors came to the opposite conclusions. Even more unfortunately, the latter doctors did not fully explain why they rejected the conclusions of the treating physicians. In light of this uncertainty, the court believes it proper to remand the case to the plan administrator for further investigation into the merits of Plaintiff's disability claim. *See Quinn*, 161 F.3d at 478 (remanding whether denial of benefits "was arbitrary and capricious, but not necessarily wrong"); *Cheng v. Unum Life Ins. Co. of America*, 291 F. Supp. 2d 717, 721 (N.D.

27

Ill. 2003) (remanding where "it is not clear one way or the other whether [claimant] is entitled to benefits").

<u>**CONCLUSION**</u>

For the reasons explained above, Defendants' motion for summary judgment (Doc. No. 14) is denied and Plaintiff's motion for summary judgment (Doc. No. 12) is granted. The case is hereby remanded to the Unum Plan administrator for further review of the merits of Plaintiff's disability claim in accordance with this opinion.

ENTER:

Dated: March 31, 2005

REBECCA R. PALLMEYER
United States District Judge